# United States Court of Appeals
## For the First Circuit

Nos. 00-1077
     00-1239
     00-1240

RICHARD E. WILSON,

Plaintiff, Appellant,

v.

TOWN OF MENDON, JAMES CROSBY, and DENNIS GRADY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Charles B. Swartwood, III, U.S. Magistrate Judge]

Before

Torruella and Lipez, Circuit Judges,
and Stearns*, District Judge.

Stephen B. Hrones, with whom Aderonke O. Lipede and Hrones & Garrity were on brief for appellant.
Leonard H. Kesten, with whom Deidre Brennan Regan and Brody, Hardoon, Perkins & Kesten were on brief for the Town of Mendon and Dennis Grady, appellees; Stephen C. Pfaff, with whom Merrick, Louison & Costello were on brief for James Crosby, appellee.

June 17, 2002

_____

*Of the District of Massachusetts, sitting by designation.

**STEARNS**, <u>District Judge</u>. This case, which unfolded against a backdrop of small town intrigue that would have excited the imagination of Grace Metalious,[1] raises interesting questions about bifurcation, a common practice in police civil rights cases, and the extent to which the parties to a case may be bound on appeal by their strategic choices at trial.

After a drunk driving arrest and a station house altercation, plaintiff-appellant Richard Wilson sued the Towns of Mendon and Hopedale, their respective chiefs of police, and five Mendon and Hopedale police officers. Prior to trial, Magistrate Judge Swartwood, presiding with the parties' consent, bifurcated Wilson's claims against the individual defendants from his claims against the Towns. As the trial date approached, the roster of defendants shrank. Ultimately, a jury entered verdicts in favor of defendant-appellee James Crosby, a Mendon police officer, and Stephen Sweet, a Hopedale police officer, on claims that they had used excessive force in subduing Wilson.[2] The jury also found for defendant-appellee Dennis Grady, the Mendon Chief of Police, on claims of negligent training and supervision. Following the verdict, Magistrate Judge Swartwood entered judgment for all defendants including the Town of Mendon.

---

[1] <u>Peyton Place</u> (Doubleday, 1956).

[2] Wilson appeals from the final judgment entered in favor of the Town of Mendon, Crosby and Chief Grady. He has not appealed the verdict favorable to Sweet.

Wilson raises four issues on appeal. He claims reversible error in: (1) the Magistrate Judge's refusal to submit a special verdict question to the jury regarding a non-defendant officer's alleged use of excessive force; (2) the court's refusal to permit expert testimony on the same subject; (3) the court's refusal to instruct the jury on theories of joint venture and failure to intervene; and (4) the court's refusal to strike disparaging comments made during closing argument about one of Wilson's lawyers. While we are of the view that the trial court was mistaken about the law in one respect, we discern no prejudice, and we therefore **affirm** the verdict.

## I.  BACKGROUND

### A.  Relevant Facts

We recite the facts in the light most favorable to the verdict. Ferragamo v. Chubb Life Ins. Co., 94 F.3d 26, 27 n.1 (1st Cir. 1996). On May 18, 1996, officer James Crosby, while on patrol on North Street in Mendon, Massachusetts, observed a green convertible stray across the double yellow median line and then drift back to the shoulder of the road, narrowly missing a parked vehicle. Crosby activated his auxiliary lights and signaled the car to stop. On approaching the driver's side of the car, Crosby detected a mild odor of alcohol. Crosby observed a passenger, Nancy Wilson, lying face down with her head wedged between the convertible's front bucket seats. When Crosby asked the driver, Richard Wilson, whether his female passenger was all right, he

-3-

replied, "she's f'in cocked." Crosby summoned officer Kristen Carchedi to the scene to attend to Nancy Wilson. Officer Sherri Tagliaferri also responded to the call, and assisted Carchedi and Crosby in taking Nancy Wilson into protective custody.[3]

At Crosby's request, Richard Wilson produced a valid driver's license but was unable to locate the vehicle's registration papers. Suspecting that Wilson might be intoxicated, Crosby directed him to perform several field sobriety tests. The results were sufficiently suggestive to cause Crosby to place Wilson under arrest for operating under the influence.[4] Upon being placed in the rear compartment of Crosby's cruiser, Wilson began screaming epithets and slamming his body against the back of the seat.

At the station, while Crosby was completing booking formalities, Wilson again became belligerent. Crosby escorted him to a cell. Once inside, Wilson began to kick at the cell door. Crosby ordered Wilson to stop. When Wilson persisted in kicking at the door, Crosby ordered him to step out of the cell.[5] Wilson refused to comply. Officer Tagliaferri then attempted to flush

---

[3]Nancy Wilson was taken by ambulance to the station after she began to vomit. She was released to her father's custody before the altercation at the station began.

[4]Wilson had difficulty performing a heel-to-toe test, and spoke in a thick-tongued and studied manner while reciting the alphabet.

[5]Crosby's intent was to manacle Wilson's legs.

-4-

Wilson from the cell by spraying him with pepper gas.[6]  Unable to find her target, Tagliaferri gave the gas cannister to Crosby, who after several attempts, succeeded in squirting the gas in Wilson's face.  Wilson responded with a tirade of threats and obscenities.  Alarmed by the ferocity of Wilson's outburst, Crosby asked that reinforcements be summoned from the neighboring Town of Hopedale.[7]

Wilson in the meantime succeeded in kicking open the door of the cell.  He then rushed into the vestibule of the cellblock with Crosby and Tagliaferri in hot pursuit.  Crosby leapt on Wilson's back while Tagliaferri grabbed Wilson's feet.  Wilson and the officers tumbled to the floor where the scrimmage continued.  Carchedi, who was not present when the struggle began, suddenly appeared, and from a crouching position let loose a spray of pepper gas, hitting Wilson and Crosby in the face.[8]  Crosby and Tagliaferri eventually succeeded in manacling Wilson's legs.

At some point during the struggle, Wilson suffered a cut to his chin, prompting Crosby to request that an ambulance be

---

[6]Pepper gas, or oleoresin capsicum, is an aerosol spray made from an oily extract of the capsicum pepper plant.  When inhaled, it induces coughing, a gagging sensation, and an inability to vocalize.  It is a less powerful version of the irritant gases marketed under the trade name Mace, and its use is authorized under standard police protocols in less threatening instances than those in which the use of Mace is sanctioned.

[7]Crosby and the two female officers, Carchedi and Tagliaferri, were the total Mendon complement then on duty.

[8]For conceptual clarity, we will refer to a first spraying incident, the one involving Crosby and Tagliaferri, and a second spraying incident involving Carchedi.

called.[9]  While waiting for the ambulance, Crosby handcuffed Wilson to a restraining rail, after which Wilson spat at him.  Once the ambulance arrived, Crosby unshackled Wilson from the rail, and placed him prone on the floor.  Officer Sweet, who was assisting Crosby, restrained Wilson by placing his foot on Wilson's back.  Wilson was taken, still manacled, by stretcher to the ambulance.  Crosby accompanied Wilson to the hospital.  During the ambulance

---

[9]Wilson's testimony at trial portrayed Crosby in a less flattering light.  According to Wilson, he began voluntarily walking towards the cell after Crosby refused him permission to make a telephone call to his uncle, a police detective in a neighboring town. Enraged, Crosby shoved Wilson against a wall, knocked him to the ground, and dragged him into the cell with his hands cuffed behind his back.  Once in the cell, Crosby kneed Wilson in the ribs and punched him several times.  Wilson admitted to shouting obscenities and kicking at the cell door in response to Crosby's taunts, but claimed to have regained his composure when Crosby, without warning, opened the cell door and sprayed several jets of pepper gas, striking Wilson in the face on the third attempt.  Crosby threw Wilson against the wall before leaving the cell.  Wilson succeeded in kicking the cell door open to escape from the fumes.  He then ran into the vestibule searching for Nancy Wilson.  Crosby jumped him from behind, while Tagliaferri tackled his legs.  Wilson testified that after he was wrestled to the floor, Carchedi ordered Crosby to lift his [Wilson's] head so that she could spray him in "the f'in face."  Crosby wrenched Wilson's head back while Carchedi sprayed both men in the face.  Wilson stated that he could not recall how he had sustained the laceration to his chin, but was certain that it had not happened during the struggle in the vestibule.  Wilson testified that after later viewing a video surveillance tape of the incident with one of his attorneys, he had come to the realization that his chin had been cut when he was kicked in the head by officer Sweet after being unshackled from the restraining bar.  Significant aspects of Wilson's trial testimony were inconsistent with his deposition testimony and the allegations made in the complaint.  Appellees claim that Wilson altered or enlarged his earlier testimony after he realized that it was contradicted by the surveillance tape.  Although rejected by the jury, we recite the gist of Wilson's trial testimony for its relevance to the issues of the propriety of Chief Grady's counsel's closing argument and the omitted instruction on Crosby's failure to protect Wilson from Carchedi.

ride, Wilson screamed threats and obscenities and spat at Crosby. Wilson was treated at the hospital for the cut to his chin.[10]

## B. **Procedural History**

On April 29, 1997, Wilson served notice on the Mendon Board of Selectmen of his negligence claims against the officers and his intent to seek damages from the Town.[11] Wilson gave similar notice to the Hopedale Board of Selectmen on November 5, 1997. On May 12, 1998, Wilson filed a complaint against the Towns of Mendon and Hopedale and Mendon officers Crosby, Sergeant Philip Dunlavey, and Chief Grady. The complaint also named as defendants Hopedale officers Sweet, Todd Boldy and Mark Boldy, as well as Eugene

---

[10]The hospital record noted no injury to Wilson other than the chin laceration.

[11]The Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 4 (ch. 258), provides in pertinent part that:

> A civil action shall not be instituted against a public employer on a claim for damages under this chapter unless the claimant shall have first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose.

Presentment is a statutory condition precedent to the bringing of a lawsuit against a municipality under the Act. Vasys v. Metro. Dist. Comm'n, 387 Mass. 51, 55 (1982). The Act is a limited waiver of the immunity of the Commonwealth and its political subdivisions from suit. The practical effect of ch. 258 is to substitute the governmental employer for the employee as the defendant and to release the employee from personal liability. The Act immunizes a municipal employee from liability for acts of ordinary and gross negligence, but not for acts of an intentional nature. Mass. Gen. Laws ch. 258, § 10(c).

Costanza, the Hopedale police chief.[12]  Carchedi and Tagliaferri were not named as defendants.

The complaint, in twenty counts, accused the defendant officers of federal and state civil rights violations.  The chiefs of police were alleged to have failed to properly train and supervise their officers.  Wilson also brought negligent training claims against the Towns, as well as numerous common law claims against the defendant officers, including claims for assault and battery, conversion, malicious prosecution, false arrest, false imprisonment, abuse of process, negligent and intentional infliction of emotional distress, invasion of privacy, defamation, negligence, and civil conspiracy.

On September 21, 1999, Magistrate Judge Swartwood bifurcated the claims against the named officers and their supervisors from the municipal liability claims.  On December 6, 1999, trial commenced on the excessive force claims involving Crosby and Sweet, and on the negligent supervision and training claims involving Chief Grady.

During the trial, the court disallowed expert testimony and denied a request for a special verdict question regarding Carchedi's alleged use of excessive force.  The court also refused to instruct the jury that Crosby could be found liable as a joint

---

[12]Summary judgment was granted to the Boldys on October 27, 1999.  Wilson states in his brief that he voluntarily dismissed his claims against the Town of Hopedale prior to trial, although this is not borne out by the trial transcript or the relevant docket entries.  In any event, Wilson does not contend that the verdict for Sweet is not conclusive of his claims against Hopedale.

venturer with Carchedi or for having failed to intervene to protect Wilson from Carchedi. Wilson duly objected. On December 17, 1999, the jury returned a verdict in favor of Crosby, Sweet, and Chief Grady. On December 21, 1999, judgment was entered for the Town of Mendon. This appeal followed.

## II. DISCUSSION

### A. Principles of Liability

A person may recover damages from a state or local official who, while acting under color of state law, commits a constitutional tort. 42 U.S.C. § 1983;[13] see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971) (imposing similar liability on federal officers). The excessive use of force by a police officer against an arrestee is such a tort. See Graham v. O'Connor, 490 U.S. 386, 395-396 & n.10 (1989). An officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers. Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990). Liability will attach to the municipal employer where its failure to properly

---

[13] 42 U.S.C. § 1983 provides that:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

train its officers "amounts to deliberate indifference to the rights of persons with whom the police come into contact," and where a specific deficiency in training is the "moving force" behind a constitutional injury. City of Canton v. Harris, 489 U.S. 378, 388-389, 391 (1989). A supervisory officer may be held liable for the behavior of his subordinate officers where his "action or inaction [is] affirmative[ly] link[ed] . . . to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' *or* 'gross negligence amounting to deliberate indifference.'" Lipsett v. University of P.R., 864 F.2d 881, 902 (1st Cir. 1988) (internal citation omitted). If, however, the officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam).

### B. **Officer Carchedi**

Wilson's principal argument on appeal is directed to the refusal of the trial court to permit the jury to consider theories of excessive force liability involving Carchedi directly or indirectly. That Carchedi had sprayed Wilson (and Crosby) with pepper gas during the scuffle in the cellblock was not late-breaking news. Wilson's April 29, 1997 presentment letter to the Town of Mendon asserted that Carchedi had "maced" him in the face, causing him to fall "face-first to the floor," allegations that

were repeated in the complaint.[14] Carchedi (and Tagliaferri) were, however, portrayed in the presentment letter and complaint as brave officers who had come "forward with the truth," only to be "ridiculed, harassed, ostracized, and silenced" for their temerity. Neither Carchedi nor Tagliaferri was named as a defendant in the complaint.

As previously noted, Magistrate Judge Swartwood had bifurcated the individual claims against the defendant officers from Wilson's claims against the municipal defendants. In this regard, the court was treading a familiar path. Without a finding of a constitutional violation on the part of a municipal employee, there cannot be a finding of section 1983 damages liability on the part of the municipality. Heller, 475 U.S. at 798-99. Thus, a defendant's verdict in a bifurcated trial forecloses any further action against the municipality, resulting in less expense for the litigants, and a lighter burden on the court.[15] On the other hand, a verdict against the municipal employee will almost always result in satisfaction of the judgment by the municipality because of the indemnification provisions typically found in bargaining agreements between municipalities and their employee unions.

---

[14]The inconsistency with Wilson's testimony at trial, where he claimed to have been "maced" by Carchedi while lying prone on the floor, was amply exploited by the defense.

[15]In phasing the trial of the case, the court will ordinarily phase discovery as well. Reopening discovery on a plaintiff's municipal liability claims remains an option in the unlikely event that the municipality chooses not to satisfy an adverse phase one judgment.

There is, however, nothing to prevent a plaintiff from foregoing the naming of an individual officer as a defendant and proceeding directly to trial against the municipality. Something of the sort happened in <u>Beck</u> v. <u>City of Pittsburgh</u>, 89 F.3d 966, 967 (3d Cir. 1996), where, after bifurcation, the plaintiff's phase one case against the defendant officer ended in a mistrial. Plaintiff then dismissed the case against the officer, and was permitted to proceed against the city on the claim that it had tolerated a custom and policy of condoning the use of excessive force by its officers, among them the original defendant.[16]

The added expense aside, the reasons that plaintiffs almost never choose to proceed against the municipality directly are self-evident. The predicate burden of proving a constitutional harm on the part of a municipal employee remains an element of the case regardless of the route chosen and is much easier to flesh out

---

[16]The cases cited by Wilson for the proposition that a section 1983 action may be prosecuted against a municipality in the absence of a named tortfeasor stand for a somewhat different principle, the right of a plaintiff to proceed against a "John Doe" defendant whose identity can only be established through discovery. This principle of fairness recognizes that a plaintiff in the heat of a confrontation with police may not know or have the opportunity to learn the identity of the alleged wrongdoer. Once that identity is discovered, a plaintiff is permitted under the liberal regime of Rule 15 to substitute the true defendant for the fictitious "John Doe." <u>See</u>, <u>e.g.</u>, <u>Carmona</u> v. <u>Toledo</u>, 215 F.3d 124, 136 (1st Cir. 2000) (reversing a district court for refusing to permit such an amendment); <u>cf.</u> <u>Figueroa</u> v. <u>Rivera</u>, 147 F.3d 77, 83 (1st Cir. 1998) (A district court "is not obligated to 'wait indefinitely for [the plaintiff] to take steps to identify and serve . . . unknown defendants.'") (quoting <u>Glaros</u> v. <u>Perse</u>, 628 F.2d 679, 685 (1st Cir. 1980)). As its caption implies, <u>Bivens</u> was such a "missing persons" case. <u>See</u> Carol M. Rice, <u>Meet John Doe: It Is Time for Federal Civil Procedure to Recognize John Doe Parties</u>, 57 U. Pitt. L. Rev. 883, 886-887, 895-897 (1996).

when the tortfeasor is a party amenable to the full powers of discovery. The burden of placing that harm in the context of a causative municipal custom and policy is significantly more onerous than the task of simply proving that an actionable wrong occurred. And finally, an abstract entity like a municipality may present a much less compelling face to a jury than a flesh and blood defendant.

The counter-argument advanced by appellees rests on the proposition that a court may "not permit the adjudication or determination of the rights or liabilities of a person unless that person is actually or constructively before it." See, e.g., Brown v. American Nat. Bank, 197 F.2d 911, 914 (10th Cir. 1952) ("It is a familiar rule of frequent enunciation that judgment may not be entered with binding effect against one not actually or constructively before the court."). From this truism, appellees extract the falsity that because Wilson failed to name Carchedi as a defendant, he "cannot now complain that the court refused to permit the jury to make a factual determination regarding her conduct." The reason that this second assertion is wrong is that Wilson was not seeking an adjudication of Carchedi's rights, nor a judgment binding on her personally. Wilson rather was seeking a factual finding regarding the implications of Carchedi's conduct for the possible liability of the Town of Mendon as her employer.[17]

---

[17]This is not meant to be dismissive of appellees' argument. There is, at first blush, a visceral unease at the idea that a person's conduct can be the subject of a jury's condemnation in a case to which the person is not a party. But it is permitted under our law. Unindicted co-conspirators are frequently the subject of

The issue remains, however, whether Wilson, under the circumstances of this case, should have been permitted to seek a finding against Carchedi as a fulcrum to use against the Town of Mendon in a subsequent trial.

### C. **The Trial and Its Prequel**

To understand how the issue of Carchedi's liability came to be framed as it is on appeal, it is necessary to visit the rulings on the subject made by the Magistrate Judge as the trial progressed, and then to explore the background against which the case was tried.

The trial began in a state of confusion as to exactly who and what were to be tried:

> THE COURT: Now, Mr. Hrones [Wilson's counsel], my understanding is the individuals that are left in this case are: James Crosby, Dennis Grady, Philip Dunlavey, the Boldys are out, Steven Sweet, and Eugene Costanza?

Hrones replied that the Town of Mendon remained in the case on the ch. 258 negligence claims, but confessed uncertainty regarding the individual defendants. Hrones stated that his co-counsel, Ms. Lipede, who had yet to arrive, would make the ultimate decision. The court then asked:

> THE COURT: Have you -- let me put it this way: Have you eliminated any of the causes of action?
>
> MR. HRONES: Yes. . . . Do you want to know what's in the case?

___

adverse jury findings, as are employees whose employers are sued directly on a theory of respondeat superior for their alleged torts.

-14-

THE COURT: Yeah. Can you give me a list, do you think?

MR. HRONES: I don't know.

. . .

MR. HRONES: I'll tell you what's in. The Federal 1983 Claim is in.

MR. KESTEN [Chief Grady's counsel]: For what?

Mr. HRONES: For everything. I mean, what do you mean for what? I mean, it's just in there. I mean, for illegal arrest, for excessive use of force, for malicious prosecution. Those are all in there. We also have the separate common law offense of malicious prosecution. That's still in there.

. . .

THE COURT: [H]ere's how we're going to do it. I'm not going to press you right now. What you're going to do is you make an opening and you make an opening on whatever you feel is in the case, okay, and then, obviously, there's going to be motions to dismiss those which are not in the case or which you don't even mention.

Lipede then appeared and stated that the claims against Chief Costanza and Sergeant Dunlavey would not be dropped. She also stated that Wilson had decided to dismiss the invasion of privacy and defamation counts, but intended to proceed on all of his other common law claims. Accordingly, Chief Costanza and Sergeant Dunlavey were introduced to the venire as defendants.[18] Then, after a lunch break, Hrones announced that Wilson was

---

[18]Chief Costanza was alleged to have been negligent in his training and supervision of Sweet. Sergeant Dunlavey was alleged to have knowingly approved a false incident report submitted by Crosby.

dismissing all claims against Costanza and Dunlavey, along with most of the common law claims against the remaining defendants.[19]

At the conclusion of her opening statement, Lipede framed the issues for the jury as follows:

> Ladies and gentlemen, I would ask that you keep an open eye -- an open mind when you review the evidence. After you review the evidence of the videotape, along with Mr. Wilson's testimony and even after you hear the testimony of the defendants, you will find that defendant James Crosby, who used pepper spray unnecessarily, should be liable to Richard Wilson for the use of excessive force; you will also find that Steven Sweet from the Town of Hopedale is liable to Richard Wilson for the use of excessive force; and you will find that defendant Dennis Grady, who is the chief of the Mendon Police Department, is liable for failing to properly train defendant James Crosby; and you will also find that the town of Hopedale was negligent in failing to train its officer Steven Sweet for negligence. Thank you, ladies and gentlemen.

While Lipede alluded to the second pepper spray incident involving Carchedi in her narrative of the facts, she did not suggest to the jury that Wilson was pressing any claim against Carchedi directly, or by extension, against Crosby based on anything Carchedi had done.

On the third day of trial, however, Hrones attempted to elicit an opinion from Melvin Tucker, a use-of-force expert called by Wilson, as to whether Carchedi's use of pepper spray during the

---

[19]Wilson specifically reserved a conversion claim against Crosby and the ch. 258 negligence claims against the Town of Mendon. Claims under the Massachusetts Civil Rights Act were later disposed of by a stipulation that the jury's finding on the section 1983 claims would be conclusive as to the state law claims. The conversion claim was dropped on the seventh day of trial.

scuffle in the vestibule was justified.[20]   The question drew an immediate objection, precipitating a lengthy discussion at sidebar. Crosby's lawyer (Pfaff) argued that Carchedi

> is not a defendant in this case, and you are
> not going to nail the Town on a [section 1983]
> claim or you are not going to try to get the
> jury to nail Crosby because Carchedi did
> something wrong.  Secondly, your theory of
> negligence in this case does not stem from
> anything that Kristen Carchedi did, and your
> 258 letter . . . does not indicate at all that
> Kristen Carchedi was negligent . . . . So you
> are precluded from getting that claim.

After further discussion, the court sustained the objection.[21]   The reasons for the judge's ruling were not initially clear, but it soon became apparent that he agreed with Pfaff's argument that the failure to assert a claim against Carchedi in the ch. 258 presentment letter also precluded the prosecution of a claim against her under section 1983.  The ruling clearly confused the prerequisites of an action under ch. 258 with those of federal section 1983.  Section 1983, unlike ch. 258, has no presentment requirement.  A section 1983 complaint need only comply with the

---

[20]The answer would have been that it was not.  Both Tucker and Chief Grady's use-of-force expert, Lt. Daniel Wicks, had reached identical conclusions about Carchedi's conduct.

[21]The judge stated that he was not excluding testimony about the facts surrounding Carchedi's use of pepper spray, but only opinion testimony about the appropriateness of her actions (and potential liability).

THE COURT: I didn't say you can't ask questions.  I'm not going to let him give an opinion on it.  That's all.  The people talked about Carchedi throughout this whole - - . . . .  I haven't stopped anyone from asking what happened, what went on.  They saw what went on.

liberal "notice pleading" standards of the Federal Rules.[22]  See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993); cf. Judge v. City of Lowell, 160 F.3d 67, 75 & n.10 (1st Cir. 1998).  The allegation in Wilson's complaint, that Carchedi had "maced" him in the face, was sufficient to satisfy this liberal pleading standard.[23]

        The issue resurfaced in an identical context on the seventh day of trial, when during the cross-examination of Chief Grady's use-of-force expert, Lt. Daniel Wicks, Hrones again raised the issue of the appropriateness of Carchedi's use of pepper spray. This drew an immediate objection.  At sidebar, Kesten pressed the notice issue:

                MR. KESTEN: Judge, we went through this.  We
                went through the presentment letter.  Mr.

---

[22]The seeds of confusion were sown by Pfaff, who insisted that the law governing ch. 258 applied with equal force to section 1983. The principal case cited by Pfaff at side bar was Tambolleo v. Town of West Boylston, 34 Mass. App. Ct. 526 (1993), which can be read to restrict the scope of a ch. 258 complaint to the precise claims identified in the presentment letter.  But see Martin v. Commonwealth, 53 Mass. App. Ct. 526, 529 (2002)("[C]lose scrutiny [of the cases] discloses that the 'strict compliance' precept is concerned more with whether presentment has been made to the proper executive officer (proper party noticed) in a timely fashion (timeliness) than with the content of the presentment (adequacy of content).").  Pfaff then segued from Tambolleo into the section 1983 claim by arguing that "to get liability against the Town . . . the underlying act done by the individual has got to be liable under 1983.  You don't have Kristen Carchedi as a defendant.  It's the law."  At the conclusion of the conference, the judge stated that "[b]ased on the law primarily as recited by Mr. Pfaff, I am going to sustain the objection."  On inquiry from Hrones, the judge made clear that he was sustaining the objection as to both the ch. 258 negligence claims and the section 1983 excessive force claim.

[23]We may, of course, uphold a correct ruling even if the reasons given for it are wrong.  Hope Furnace Assocs., Inc. v. FDIC, 71 F.3d 39, 42 (1st Cir. 1995).

> Pfaff gave [you] the cases. They had every opportunity to put the Town on notice. . . . The law is clear on this. They never said for a moment that Officer Carchedi [had done something wrong] until Mr. Hrones actually called me this summer and said he might amend the complaint, and I said, Go ahead and try it. He didn't do it.

To this, Hrones responded:

> MR. HRONES: Let's not confuse two points. We're dealing with 1983, and so I am going to put presentment aside. . . . I don't know why people are hung up on the fact that [Carchedi] was not charged as a defendant. You simply don't have to do that, your Honor. You can [choose] whoever you want to charge.[24]
>
> . . .
>
> THE COURT: I've made a ruling on this before, and I'm going to be consistent. I'm going to sustain the objection.

At a charging conference the following day, Pfaff asked the court for an instruction "that the jury is not to consider the actions of Miss Carchedi for any purposes of liability against any of the defendants. . . . [A]s I have pointed out before, Carchedi has not been named as a defendant here for 1983 purposes, and I think Mr. Hrones is still trying to push that point." The court declined to give the requested instruction, but cautioned Hrones against making any argument about Carchedi "with respect to recovery in this case." When Hrones objected to the restriction, arguing that Crosby and Carchedi might be found by the jury to have acted as co-venturers during the second spraying incident, the

_____

[24]Perhaps to clarify this point, Hrones announced at the next day's charging conference that Wilson was waiving his ch. 258 claims against the Town of Mendon.

-19-

court responded, "That is my ruling. That's been my ruling. I've been consistent all the way through on that issue."[25]

Finally, on the ninth and closing day of trial, the issue arose as to the extent counsel would be permitted to refer to Carchedi in closing argument. When the court indicated that it was inclined to exclude all mention of her, both sides objected, reminding the judge that the jury had heard a substantial amount of testimony about Carchedi and had seen repeated showings of the videotape. The court relented, stating:

> I'm not going to go through each one of the alleged excessive force [incidents] because it's not for me to find exactly what occurred. It's for the jury to determine what exactly occurred. So consistent with that, my ruling is[,] is that obviously anything that's on the tape is in evidence and can be commented on. There will be no argument to the jury that actions by Officers Tagliaferri and Carchedi were in any way, in any way part of the liability of any of the defendants left in this case. And that's how I'm going to do it.

What makes this case unusual is that Carchedi was not, contrary to expectation, named as a defendant by Wilson. The reason Carchedi was not named becomes apparent only on a close reading of the trial transcript and the pleadings filed in a related and previously tried case.

Without delving into unnecessary detail, Richard Wilson's encounter with Crosby and Carchedi on the night of May 18, 1996, played itself out against a backdrop of parochial police politics.

---

[25]The court then made clear over Hrones' objection that the same reasoning applied to any attempt to argue liability based on Tagliaferri's conduct. Wilson has not pursued this ruling on appeal.

-20-

The Mendon Police Department, small as it was, was riven by a factional struggle over appointments to its few full-time positions. As it happened, at the time of Wilson's arrest, Carchedi and Crosby were pitted against one another as finalists for one of those positions. The selectmen eventually awarded the appointment to Crosby. Tagliaferri, who had unsuccessfully vied for another open position, filed a complaint, later joined by Carchedi, with the EEOC and the MCAD alleging disparate treatment in the Town's consideration of their candidacies. In August of 1997, the two women officers, together with Tagliaferri's step-father, Martin Auty, a Mendon selectman and police lieutenant, brought a lawsuit (the Auty case) against the Town, the police union, and most of their departmental colleagues (Chief Grady and Crosby among them) alleging, inter alia, espionage, defamation, gender discrimination, retaliation and invasion of privacy.[26] Among the allegations in the complaint was a claim that Carchedi and Tagliaferri had been unfairly disciplined for suggesting that the videotape of the altercation with Wilson had been tampered with as part of a cover-up.

In April of 1997, Wilson's criminal case came to trial. Carchedi and Tagliaferri testified favorably for Wilson, leading to his acquittal on all charges. After Wilson brought the instant

---

[26]The defendants were also alleged to have circulated false rumors that Auty was involved in an illicit affair with Carchedi and had, as a result, used his position as a selectman to advocate her appointment to a permanent position.

complaint, the Auty case went to trial before Magistrate Judge Swartwood. The trial went badly for the plaintiffs.

Two weeks before the jury was seated, Chief Grady, Crosby and the Town of Mendon were permitted to amend their answer to the complaint by asserting a counterclaim alleging, inter alia, a civil conspiracy on the part of Auty, Carchedi and Tagliaferri. In essence, the defendants maintained that the three plaintiffs had conspired to perjure themselves at Wilson's criminal trial by testifying that Wilson had not appeared intoxicated at the time of his arrest and that Crosby had used unnecessary force during the confrontation in the cellblock.[27] The defendants claimed that the goal of the conspiracy was to assist Wilson in his civil case as a means of punishing the Town for its failure to give Carchedi a permanent position and to retaliate against Crosby for having taken the appointment in her stead.

On March 16, 1999, after a twenty-five day trial, the jury ruled against plaintiffs on all claims and found for the Town of Mendon and Crosby on the civil conspiracy counterclaim. The jury awarded $25,000 in damages to the Town of Mendon and $5,000 in damages to Crosby, which were apportioned among the three plaintiffs.[28]

---

[27]Auty, who was not at the station on the night of the incident, was alleged to have falsely testified that he had inspected the door to Wilson's cell the following day without observing any damage.

[28]The jury also awarded Chief Grady $5,000 in damages against Auty on an invasion of privacy claim.

Given the jury's finding in the Auty case, Carchedi (and Tagliaferri) were, to put it mildly, "damaged goods," a fact of which all involved in the instant trial, including Magistrate Judge Swartwood, were keenly aware. On the first day of trial, prior to the empanelment, the subject of the prior jury verdict arose obliquely during a discussion of the viability of Wilson's claim of malicious prosecution.

> MR. KESTEN: He has a malicious prosecution claim. To do that he needs to show he was acquitted. There's a first larger question. If he wants to press it, if he wants to, the defense is that he wasn't acquitted because the prosecution wasn't malicious. He was acquitted because there was a conspiracy from these people to lie for him . . . which was proven. It goes in for that. That's issue preclusion [sic]. That's been proven that the three officers, J. Martin Auty, Kristen [Carchedi], and Sherri Tagliaferri, conspired to lie in the Wilson case. That was the finding of the jury.

After some further discussion, the court ruled that "if the malicious prosecution claim is around and the defendants say that the reason why he was acquitted [was] because everybody was in the tank with him, then I'm going to allow them to explore that." In response to this ruling Hrones announced, prior to opening statements, that the claims of malicious prosecution and false arrest were being dropped.

Under the circumstances, the decision not to name Carchedi as a defendant, or to call her as a witness at trial, despite the goading of the defendants to do so, was a predictable choice given the near certainty that her presence would have opened the door to evidence of the jury's finding in the Auty case.

-23-

Wilson's alternate strategy was to concentrate his fire on Crosby and Chief Grady, a choice that the defendants had clearly anticipated, and one to which Wilson, after some initial first-day confusion, clearly committed himself. Only after the trial was well underway did Wilson seek to reinject Carchedi into the case.

We find Wilson's mid-trial switch in strategy troubling and ultimately unfair. What Wilson, through counsel, was seeking to accomplish was to wield Carchedi as a blunt instrument against the Town of Mendon without having the jury exposed to the taint of the verdict against her in the Auty case. Hence, Wilson decided to omit Carchedi from the case as a defendant and to drop all claims that would have permitted the defendants to present evidence, as they were prepared to do, that Wilson's criminal acquittal had been obtained through Carchedi's perjured testimony.

As a practical matter, the contours of a trial are often defined by the litigating positions taken by the parties' lawyers. At times counsel will, for tactical advantage, seek to try the case on the broadest grounds possible. Or there may be, as was the case here, sound reasons for drawing the issues to be tried as circumspectly as possible. For Wilson, Carchedi was potentially the quintessential elephant in the jury box. She was no great bargain for the defendants either, given the finding of their own expert that her use of force had been inappropriate. Both sides went into the trial with every reason to exile Carchedi to the periphery of the litigation.

In recognition of the realities of the give-and-take of trial, appellate courts are reluctant to second-guess the tactical decisions of trial counsel for fear of opening a floodgate of buyer's remorse. Thus, it is the rule that a litigant will be held to the strategic choices made by counsel in all but the most egregious instances. See, e.g., United States v. LaVallee, 448 F.2d 671, 679 (2d Cir. 1971); Leblanc v. I.N.S., 715 F,2d 685, 694 (1st Cir. 1983); see also United States v. One Lot of $25,721.00 in Currency, 938 F.2d 1417, 1422 (1st Cir. 1991). Here, the Magistrate Judge invited Wilson's co-counsel in her opening statement to state the specific claims that would be tried. She did so, conspicuously omitting any claim against Carchedi. Wilson thus having committed himself to that course, we cannot fault the Magistrate Judge for enforcing the bargain, even though we may disagree with his stated reasons for having done so.

In sum, in principle we agree with Wilson's argument that the failure to name Carchedi was not fatal to his section 1983 case against the Town of Mendon; however, in the circumstances of this case, Wilson - having chosen a strategy intended to keep the full truth about Carchedi and his own criminal trial from the jury - cannot now complain of being hoisted on a petard of his own contrivance.

### D. **Expert Testimony**

Having found no error in the trial court's rejection of Wilson's request that the jury be asked to make a factual finding as to whether Carchedi had used excessive force during the second

spraying incident, we conclude that the claim that the court erred in excluding expert testimony on the subject fails as a matter of course.

### E. Rejected Instructions Concerning Crosby

Wilson objected to the judge's refusal to instruct on two alternate theories of liability implicating Crosby, both of which involved Carchedi: (1) that Crosby could be found liable for having failed to protect Wilson from Carchedi during the second spraying incident; or (2) that Crosby could be found liable as a joint tortfeasor with Carchedi.

"[A] trial court's refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998) (quoting United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995)). "A [litigant] is not entitled to any specific words of instruction, but only to instructions that properly convey the applicable law of the case." Kinan v. City of Brockton, 876 F.2d 1029, 1037 (1st Cir. 1989) (quoting Kibbe v. City of Springfield, 777 F.2d 801, 810 (1st Cir. 1985)).

It is settled in this Circuit that an officer may be liable for failing to intervene in appropriate circumstances to protect a detainee from the excessive use of force by a fellow officer. Gadreault, 923 F.2d at 207 n.3. However, in Gadreault,

this Court found no liability where an attack "was over in a matter of seconds," because the defendant officers "did not have a realistic opportunity to intercede." Davis v. Rennie, 264 F.3d 86, 98 n.10 (1st Cir. 2001) (discussing Gadreault). The struggle in the cellblock vestibule lasted only a few seconds. Carchedi was not initially involved as a combatant. She appeared on the scene while Crosby and Tagliaferri were thrashing about in the effort to subdue Wilson. In these circumstances, even if the jury were to credit Wilson's testimony that Carchedi had ordered Crosby to hold up Wilson's head (the better to spray him), it could not reasonably find that Crosby had had an opportunity to reflect on the wisdom of obeying Carchedi's command.[29]

The request for a "joint tortfeasor" instruction fails for a similar reason, although as a preliminary matter, we do not agree with appellees' argument that "'joint tortfeasor' liability

---

[29]In analogous cases alleging due process violations arising out of prison riots, the Supreme Court has contrasted circumstances like those involved in high-speed pursuits in which officers are forced to make split-second judgments, where the degree of fault must be extremely high before liability attaches, with those in which officers have sufficient opportunity to reflect on their course of action, as in cases involving inmate welfare, where the degree of fault required is correspondingly lower. County of Sacramento v. Lewis, 523 U.S. 833, 852-853 (1998) (citing Whitley v. Albers, 475 U.S. 312, 320 (1986)). Applying this analysis to police pursuit cases, the Court noted, "[l]ike prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. . . . They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" Lewis, 523 U.S. at 853 (citation and internal quotations omitted). In the former type of case, the Court held that liability cannot be premised on "mid-level fault." Id. This same general principle informs our analysis in failure to intervene cases.

does not appear to exist under [section] 1983." As we pointed out in <u>Martinez</u> v. <u>Colon</u>, 54 F.3d 980, 985 n.4 (1st Cir. 1995):

> A constitutional duty to intervene may . . . arise if onlooker officers are instrumental in assisting the actual attacker to place the victim in a vulnerable position. . . . In such a scenario, the onlooker officers and the aggressor officer are essentially joint tortfeasors and, therefore, may incur shared constitutional responsibility. <u>See</u> <u>generally</u> <u>Monroe</u> v. <u>Pape</u>, 365 U.S. 167, 187 . . . (1961) (advising courts to read section 1983 against the backdrop of historical tort liability).

Here, however, as in <u>Martinez</u>, there is no evidence to support the existence of a joint enterprise between Crosby and Carchedi. Carchedi, as noted, intervened only after the fray had begun. While there is no requirement that a plaintiff seeking to establish joint venture liability prove the existence of an anticipatory compact, aiding and abetting liability does require proof that a defendant "associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." <u>United States</u> v. <u>Garcia-Rosa</u>, 876 F.2d 209, 217 (1st Cir. 1989). Mere presence, which is the most that can be said about Crosby, does not establish a joint venture. <u>United States</u> v. <u>Hensel</u>, 699 F.2d 18, 36 (1st Cir. 1983).

The issue for the jury was whether Crosby had used excessive force against Wilson at any time during his detention. The court properly instructed the jury in this regard:

> Mr. Wilson alleges that Officer Crosby used excessive force against him by spraying him with pepper spray, by pushing him, by forcing him to the floor or into the cell and by kicking or kneeing him. . . . You have viewed the videotape and have listened to the

-28-

> evidence, and it is for you to determine the circumstances of *any* physical contact between Officer Crosby and Mr. Wilson . . . . (emphasis added).

Consistent with this instruction the court put two special questions regarding Crosby to the jury. The first asked whether Crosby's use of pepper spray constituted an excessive use of force; the second asked whether Crosby had used excessive force against Wilson "<u>at any other time</u>." (Emphasis added). We see no error.

## III. DEFENSE COUNSEL'S ARGUMENT

Finally, Wilson objects to the following comments made by Chief Grady's counsel (Kesten), during closing argument:[30]

> Mr. Wilson has been reviewing that tape over and over again beginning with Attorney Strand over there, and they made up a story. . . . And their claim is -- and you heard that after viewing this video and meeting with Attorney Strand, a letter was written by Attorney Strand [in] which they came up with the phantom prey. They came up with lots of stories. None of it happened.[31]

---

[30]Appellees argue that Wilson waived this ground of appeal by failing to object at the time the offending comment was made. We are loath to impose a rule that would require counsel to abandon professionalism and decorum by routinely interrupting the other side's closing argument to avoid the risk of waiving an objection entirely. Absent the most egregious circumstances, attorneys should, and generally do, wait until the conclusion of an opponent's argument to voice such objections. <u>See</u>, <u>e.g.</u>, <u>Computer Syst. Eng'g</u> v. <u>Qantel Corp.</u>, 740 F.2d 59, 69 (1st Cir. 1984) (finding counsel's objections to improper closing argument untimely where the attorney had the opportunity but failed to raise objections outside the presence of the jury, at the time of argument, and at a sidebar conference immediately following the argument).

[31]Wilson's rendition of the transcript substitutes "phantom spray" for "phantom prey," an allusion to Carchedi's involvement in the second pepper spraying incident. It is clear from the context of the remark, however, that the reference was to Sweet as a

While the insinuation that Wilson had concocted "stories" with the connivance of his lawyer should not have been made, the point that Wilson had no independent recollection of how he had come to suffer a laceration to his chin was invited by his own testimony.

> Q.   Isn't it a fact, sir, that you came to the conclusion that Officer Sweet had kicked your head only when Mr. Strand told you that that had happened?
>
> A.   We viewed the videotape, yes.
>
> Q.   Is that a no, sir, or yes?
>
> A.   Yes.  When we viewed the videotape.
>
> . . .
>
> Q.   Page 158, Line 3, at that same deposition, sir, were you asked the following question and did you give the following response:
>
> "QUESTION: Was it the first time you watched the videotape with your lawyer that you understood in your mind that it was a Hopedale officer that had cut your chin?
>
> "ANSWER: When Bob point[ed] it out, yes."
>
> A.   Yes.
>
> Q.   And Bob is Mr. Strand, Correct?
>
> A.   Yes, sir.  I already said that, yes.

Wilson's credibility was the pivotal issue at trial, and his memory of events was a fair subject for comment.  There was no

---

"phantom" defendant, "the Admiral Stockdale of this case," who, according to Kesten, should never have been named in the lawsuit.

basis, however, for the insinuation that attorney Strand had incited Wilson to perjury. But in context the comment was fleeting and, given the trial theatrics in which counsel for both sides engaged, would likely have been recognized by the jury as yet another display of barristerial excess. Moreover, we are confident, that if there was any prejudice, it was cured by the court's admonition to the jury, both in its preliminary and concluding instructions, that the lawyers' statements and arguments were not to be considered as evidence. See <u>Brandt</u> v. <u>Wand Partners</u>, 242 F.3d 6, 23 (1st Cir. 2001).

Because we find no reversible error, the judgment of the district court is **<u>affirmed</u>**. No costs are awarded.