# United States Court of Appeals
## For the First Circuit

No. 19-2069

LAWRENCE ROLAND OUELLETTE,

Plaintiff, Appellant,

v.

ROGER BEAUPRE, individually and in his official capacity as
Chief of Police for the Biddeford Police Department;
CITY OF BIDDEFORD,

Defendants, Appellees,

NORMAN GAUDETTE,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Walter F. McKee, Matthew D. Morgan, Kurt C. Peterson, and
McKee Law LLC, P.A. on brief for appellant.
Timothy J. Bryant, Jonathan G. Mermin, and Preti Flaherty on
brief for appellee, Roger Beaupre.
Keith R. Jacques and Woodman Edmands Danylik Austin Smith and
Jacques on brief for appellee, City of Biddeford.

October 7, 2020

**LIPEZ**, <u>**Circuit Judge**</u>.  Appellant Lawrence Ouellette alleges that he was sexually abused as a teenager in the late 1980s by a Biddeford Police Department ("BPD") officer, Captain Norman Gaudette.  Although Ouellette reported the abuse to the BPD in that same timeframe and an investigation ensued, Ouellette only learned in 2015 through a series of social media posts that the BPD, and specifically Chief of Police Roger Beaupre, allegedly knew of at least one other report of Gaudette sexually abusing a minor that pre-dated Ouellette's experience.  The posts also described a pattern of alleged sexual misconduct by BPD officers over the past thirty years.

Armed with this newly discovered information, Ouellette brought suit on October 29, 2015, pursuant to 42 U.S.C. § 1983, against Gaudette, the City of Biddeford, and Beaupre alleging, as relevant here, that the City and Beaupre were deliberately indifferent to Gaudette's violation of his constitutional rights. The City and Beaupre (collectively, "appellees") moved for summary judgment, arguing, inter alia, that Ouellette's suit was barred by the statute of limitations.  In response, Ouellette asserted that, pursuant to the federal discovery rule, his claims against the City and Beaupre did not accrue until 2015, when he first learned of their role in facilitating Gaudette's unconstitutional conduct.

The district court granted appellees' motion, agreeing with their contention that Ouellette's claims are nearly twenty

- 3 -

years late under the applicable statute of limitations.  Finding no basis for summary judgment on this ground, we vacate and remand the case for further proceedings.

**I.**

**A.    Factual Background**

We draw the factual background from the evidence in the summary judgment record and the parties' statements of undisputed facts.  Ouellette first met Gaudette in late 1986 or early 1987, when he was fifteen years old.  Gaudette introduced himself as a captain of the BPD and, with police radio in hand, offered Ouellette a ride home from school, which Ouellette accepted.  When Gaudette dropped Ouellette off at home, he asked Ouellette's mother if Ouellette could work at Twin City Cleaning, a commercial cleaning business run by Gaudette and his wife.  Ouellette's mother, who apparently knew Gaudette, gave her permission, and Ouellette began working for Twin City Cleaning.

According to Ouellette, he and Gaudette had their first sexual encounter in the late summer or early fall of 1987 in a KeyBank facility that Twin City Cleaning had been hired to service.  Gaudette allegedly asked Ouellette to accept fifty dollars in exchange for engaging in oral sex with him.  Thus began a series of more than twenty encounters between 1987 and the fall of 1988 in which, Ouellette claims, he and Gaudette engaged in oral sex, sometimes in exchange for money.  According to Ouellette, these

incidents frequently took place in Ouellette's mother's house while Gaudette was on duty with his BPD police radio switched on. Occasionally, Ouellette would meet Gaudette at the police station before they went to his mother's house together; other times, Gaudette would call Ouellette from his BPD office to make sure that Ouellette was home before driving to meet him.

Ouellette also testified that Gaudette took him on camping trips. During one camping trip to Naples, Maine, in the spring of 1988, Gaudette allegedly provided liquor to Ouellette, who passed out, and awoke with pain in his genitals, a torn rectum, and blood and feces in his underwear. Ouellette believes that Gaudette raped him while he was unconscious.

During this period of alleged abuse, Gaudette helped Ouellette with legal problems on two occasions. Once, after Ouellette had his learner's permit revoked, Gaudette "spoke to the judge and got it straightened out." On another occasion, Gaudette intervened on Ouellette's behalf after Ouellette was charged with driving with a suspended license.

Ouellette first reported Gaudette's alleged abuse to BPD Detective Terry Davis in 1988 or 1989. Davis, who had no prior relationship with Ouellette, called Ouellette and told him that he was worried about him. Shortly thereafter, Ouellette met with Davis at the BPD station, and later also met with BPD Detective Richard Gagne. He told both Davis and Gagne about the incident

that occurred in Naples, but he did not share information about the instances of oral sex.

In the fall of 1990, Gagne told Chief Beaupre about Ouellette's allegations against Gaudette. Beaupre instructed Gagne to refer the matter to the York County District Attorney's office, which Gagne did. The York County District Attorney's Office in turn referred the matter to the Maine Attorney General's Office for further investigation.

Unbeknownst to Ouellette, by the time he reported Gaudette's abuse to the BPD, the Department had already received at least two complaints from individuals who claimed that Gaudette had sexually abused them during their teenage years. In the early 1980s, a minor reported to BPD Officers Joanne Fisk and Alphee Lambert, as well as BPD Detective Richard Gagne, that Gaudette had engaged in inappropriate sexual contact with him.[1] In the mid-1980s, yet another individual reported to the BPD that Gaudette had sexually assaulted him. That individual provided a written statement to Deputy Chief Benoit Martin, which Martin forwarded to Chief Beaupre. Although there is some dispute regarding the exact steps, if any, that the BPD took to investigate these two reports,

---

[1] BPD Officer Robert Devou also testified that he saw the minor's statement in the possession of Deputy Chief Benoit Martin, who told Devou that Chief Beaupre had assigned it to him to investigate. Beaupre, however, denied having any recollection of seeing that particular report.

it is undisputed that no disciplinary action was taken in response to these reports prior to Gaudette's alleged abuse of Ouellette.[2]

Meanwhile, in or around October 1990, the Maine Attorney General's Office sent Investigator Michael Pulire to speak to Ouellette. Ouellette reported some of his alleged experiences of abuse to Pulire, including that Gaudette would offer him money for oral sex and that Gaudette would touch Ouellette's genitals when they went camping together. He did not tell Pulire about the alleged rape in Naples, Maine.[3]

Pulire also visited Chief Beaupre and informed him that he was conducting an investigation into allegations of sexual abuse against Gaudette. Beaupre assigned two BPD officers to assist Pulire with the investigation and placed Gaudette on administrative leave after meeting with Pulire.

The Maine Attorney General's Office investigation ultimately resulted in a presentation to the York County Grand Jury. A few weeks before the grand jury presentation, Ouellette

---

[2] Around the time Ouellette reported his alleged abuse to the BPD, Chief Beaupre also received a report that a different BPD officer, Sergeant Stephen Dodd, had allegedly engaged in sexual abuse of a minor. Later, other individuals also reported alleged sexual abuse by Dodd to the BPD and Beaupre, and yet another individual alleged in a report to the BPD in 2008 that she had been sexually assaulted by Devou.

[3] At some point, however, Ouellette told a different representative from the Maine Attorney General's Office -- Assistant Attorney General Eric Wright -- about that incident.

met with York County District Attorney Michael Cantara and again described the sexual abuse that he allegedly suffered at the hands of Gaudette. However, the grand jury proceeding was ultimately limited to a presentation regarding one of the other individuals who had alleged that Gaudette sexually abused him. The grand jury declined to indict Gaudette.

While the Maine Attorney General's Office investigation was underway, but before it culminated in the grand jury presentation, Chief Beaupre also initiated a separate BPD Internal Affairs investigation into allegations of sexual abuse against Gaudette. The deposition testimony given in this case reveals that some of the details of this investigation are disputed. Chief Beaupre testified, consistent with contemporaneous documentary evidence, that he assigned Captain Royal Marcoux to lead the Internal Affairs investigation. However, Marcoux testified that he refused to lead an investigation into a fellow captain and that Beaupre must have reassigned the investigation to someone else.

Additionally, Gagne testified that he invited Ouellette to come to the BPD station to be interviewed for the Internal Affairs investigation, but Ouellette never responded. Ouellette testified that he was never invited to participate in the Internal Affairs investigation and did not even know that such an investigation was going on at the time. In any event, a memorandum in the record from Chief Beaupre dated May 17, 1991, indicates

that the Internal Affairs investigation was closed at that time with a final disposition of "No Action Taken." After both the Maine Attorney General's Office investigation and the BPD Internal Affairs investigation were completed, Beaupre reinstated Gaudette to his position.

Ouellette tried to move on with his life. However, in 2015, he saw numerous social media postings about allegations of sexual abuse committed by multiple BPD officers, including Gaudette. Through these social media postings and their subsequent coverage in the local media, Ouellette learned for the first time that the BPD and Chief Beaupre, although aware of allegations against Gaudette that predated Ouellette's alleged abuse, had not taken any disciplinary action against Gaudette.

This information surprised Ouellette, who never suspected that "a police department that [he] trusted would ever tolerate criminal and abusive behavior by an officer within its ranks." Prior to the social media postings, none of the allegations against Gaudette or any of the other BPD officers accused of sexual misconduct were public. The BPD Internal Affairs investigation, as well as the Maine Attorney General's investigation and York County Grand Jury presentation, were kept confidential and never publicized outside of the respective offices responsible for them.

**B.    Procedural History**

Ouellette filed this lawsuit in state court on October 29, 2015 -- less than a year after the social media posts publicized the stories of other alleged sexual abuse victims of BPD officers, including Gaudette.  In his complaint, Ouellette asserted constitutional claims pursuant to 42 U.S.C. § 1983 against Gaudette and appellees, as well as a state law negligent supervision claim against appellees.  After the case was removed to federal court on the basis of federal question jurisdiction, Ouellette amended his complaint to add a state law sexual assault claim against Gaudette and to clarify that he was not aware of Beaupre and the City of Biddeford's role in violating his constitutional rights until 2015.

Ouellette's constitutional claims against appellees are based on a theory of deliberate indifference -- that appellees knew about sexual misconduct by BPD officers, including Gaudette, and tacitly condoned it by failing to supervise and train officers regarding appropriate conduct, failing to adequately investigate allegations of sexual assault, and failing to discipline bad actors within the police force.  According to Ouellette's amended complaint, this deliberate indifference facilitated Gaudette's sexual abuse of Ouellette and deprivation of his constitutional

- 10 -

right to be free from violations of bodily integrity at the hands of a state actor.[4]

Shortly after filing his complaint, Ouellette stipulated to the dismissal of his § 1983 claim against Gaudette and his state law negligent supervision claim against appellees, acknowledging that both were time-barred on the face of the complaint. Discovery then commenced as to the remaining state law sexual assault claim against Gaudette, as well as the § 1983 claims against Beaupre and the City of Biddeford. Over the course of several years, the parties conducted more than seventy-five depositions, but a search of the BPD's records for documents related to allegations of sexual assault against Gaudette yielded no results.[5]

---

[4] Although Ouellette does not use this explicit characterization in his complaint, we understand him to bring a Fourteenth Amendment substantive due process claim. See Martínez v. Cui, 608 F.3d 54, 58 (1st Cir. 2010) (stating that a claim alleging infringement by a state officer of the right to bodily integrity is "appropriately characterized . . . as a Fourteenth Amendment substantive due process claim").

[5] The BPD had a policy of retaining offense reports, arrest reports, and dispatch cards from prior to 1998 in storage trailers, and access was strictly controlled by Beaupre, who kept the only key in his office. A search of those trailers was conducted as part of this case, but no documents relating to allegations against Gaudette were found there.

The BPD did not have a specific policy for retention of documents related to allegations of sexual misconduct against BPD officers in the 1980s. Gaudette's personnel file, reviewed by the parties during discovery in this case, did not contain any references to reports of sexual misconduct.

After discovery was complete, appellees moved for summary judgment on Ouellette's § 1983 claims. They argued: (1) the claims were time-barred pursuant to the statute of limitations; (2) Gaudette was not acting under color of state law when he allegedly sexually abused Ouellette; (3) there was insufficient evidence to support Ouellette's allegations of supervisory liability; and (4) Beaupre was entitled to qualified immunity.

The district court addressed only the first ground asserted, granting summary judgment to appellees on the basis of the statute of limitations and rejecting Ouellette's contention that his claims against Beaupre and the City of Biddeford were timely under the federal discovery rule. The court held that Ouellette's awareness of Gaudette's affiliation with the BPD provided Ouellette with enough information for his claims against the City and Beaupre to accrue at the time of his injury, in the late 1980s. See Ouellette v. Gaudette, No. 2:16-cv-00053-LEW, 2019 WL 4467633, at *4-5 & n.5 (D. Me. Sept. 18, 2019). Alternatively, the court concluded that even if Ouellette's awareness of Gaudette's affiliation with the BPD at the time of his injury was not sufficient for purposes of accrual, it still provided him with enough information to lead a reasonable person in his position to investigate whether the City and Beaupre had a role in causing his injury. See id. at *4. In the district court's view, if Ouellette had diligently undertaken such an

- 12 -

investigation, he would have uncovered enough information for his claims to accrue at some unspecified point prior to 1995, six years after he reached the age of majority, the end point of the applicable statute of limitations.  See id.

Ouellette timely appealed.

## II.

We review a grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party. See Lapointe v. Silko Motor Sales, Inc., 926 F.3d 52, 54 (1st Cir. 2019).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Facts are deemed "material" if "they have the 'potential to affect the outcome of the suit under the applicable law,'" and a dispute is deemed "'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'"  Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

Where, as here, a defendant moves for summary judgment on the basis of an affirmative defense -- like the statute of limitations -- the defendant bears the burden of proof and "cannot attain summary judgment unless the evidence that he provides on that issue is conclusive."  See Torres Vargas v. Santiago Cummings,

- 13 -

149 F.3d 29, 35 (1st Cir. 1998).  If the defendant produces such conclusive evidence, "the burden shifts to the plaintiff to establish that the statute of limitations does not apply." Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 50 n.10 (1st Cir. 2011).

## A. Statute of Limitations for § 1983 Claims

To determine the statute of limitations for a § 1983 cause of action, federal courts look to "the law of the [s]tate in which the cause of action arose."  Wallace v. Kato, 549 U.S. 384, 387 (2007).  Specifically, courts apply that state's designated limitations period for general personal injury torts, see Owens v. Okure, 488 U.S. 235, 236 (1989), as well as its "coordinate tolling rules," see Bd. of Regents of Univ. of N.Y. v. Tomanio, 446 U.S. 478, 484 (1980).  The parties agree that, for Ouellette's § 1983 claims against the City of Biddeford and Beaupre, the court should use Maine's statute of limitations for all unenumerated civil actions, including personal injury torts, which is six years from the date of accrual.  See Me. Stat. tit. 14, § 752 ("All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards . . . .").

Maine law also provides that the statute of limitations for civil actions may be tolled until a plaintiff reaches the age of majority.  Id. § 853.  Thus, the six-year statute of limitations

- 14 -

for a § 1983 claim brought in the state of Maine based on an injury that accrued when the plaintiff was a minor will not expire until six years after the plaintiff turns eighteen.  See id.

The application of these statutory provisions to Ouellette's § 1983 claims is not in dispute.  The facts in the record reveal that Ouellette was a minor when he was allegedly abused by Gaudette, and that he reached the age of majority in June 1989.  Six years after June 1989 was June 1995.  Accordingly, if Ouellette's claims against appellees, filed in 2015, accrued at the time of his injury in the late 1980s or at any point prior to 1995, they are time-barred by nearly twenty years.  This case thus turns on our assessment of when a jury could reasonably find that Ouellette's § 1983 claims against appellees accrued.

B.  **Accrual of § 1983 Claims**

Although federal courts look to state law for the statute of limitations and tolling principles, "the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law."  Wallace, 549 U.S. at 388 (emphasis omitted); see Conjugal P'ship Acevedo-Príncipe v. United States, 768 F.3d 51, 56 (1st Cir. 2014).  Under federal law, a § 1983 claim accrues when the putative "'plaintiff has a complete and present cause of action,' . . . that is, when 'the plaintiff can file suit and obtain relief.'"  Wallace, 549 U.S. at 388 (quoting Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar

- 15 -

Corp. of Cal., 522 U.S. 192, 201 (1997)).  In this context, a § 1983 plaintiff has "a complete and present cause of action" when all of the acts comprising the specific constitutional violation have been completed.  See McDonough v. Smith, 139 S. Ct. 2149, 2155 (2019).  However, pursuant to the federal discovery rule, accrual is delayed until the plaintiff knows, or should know, of those acts.  Specifically, a plaintiff must, or should, be aware of both the fact of his or her injury and the injury's likely causal connection with the putative defendant.  See Jardín de las Catalinas Ltd. P'ship v. Joyner, 766 F.3d 127, 133 (1st Cir. 2014) (citing United States v. Kubrick, 444 U.S. 111, 122 (1979)); see also Skwira v. United States, 344 F.3d 64, 78 (1st Cir. 2003).

There are some cases in which this information is or should be apparent to the plaintiff at the time of the injury. For example, in Vega-Velez v. United States, we held that a claim brought pursuant to the Federal Tort Claims Act ("FTCA") accrued at the time that the plaintiff, a security guard working at a federal courthouse, suffered a slip and fall while on duty.  800 F.2d 288, 289 (1st Cir. 1986) (per curiam).  At that point, the plaintiff knew both that he had been injured and that the federal government (the owner and operator of the courthouse) was likely liable for causing that injury.

In other cases, however, an injury may lie dormant without manifestation until days, months, or even years after it

has occurred.[6]  See Kubrick, 444 U.S. at 122; see also Villarini Garcia v. Hosp. del Maestro, Inc., 8 F.3d 81, 84 (1st Cir. 1993) (describing the classic case as "the sponge, negligently left inside the patient during the operation, whose ill effects are not apparent for several years").  And in other cases still, the injury may be apparent, but "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain."  Jardín de las Catalinas, 766 F.3d at 133 (alteration omitted) (quoting Kubrick, 444 U.S. at 122).  Under either of these circumstances, the federal discovery rule delays accrual until "a reasonably prudent person similarly situated" to the plaintiff would discover these two key pieces of factual information -- namely, the existence of the injury and its probable cause.  See id. (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)); Kubrick, 444 U.S. at 118.

The nature of this information as "factual" is key.  In Kubrick, the seminal Supreme Court case establishing the federal discovery rule,[7] the Court was careful to distinguish between

_____

[6] This scenario is not before us, as Ouellette concedes that he was aware of his injury at the time that it occurred, and he did not suppress memories of Gaudette's abuse, although he tried not to think about it because it was so upsetting.

[7] Although Kubrick applied the federal discovery rule to a medical malpractice claim brought pursuant to the FTCA, 444 U.S. at 121-25, our circuit "has applied the discovery rule outside of the medical malpractice context, making of it a general rule," Rakes v. United States, 442 F.3d 7, 19 (1st Cir. 2006).  See id. at 11, 19 (extortion); Skwira, 344 F.3d at 67-68, 74-75 (wrongful

- 17 -

ignorance of the facts, including an injury and its cause, and ignorance of the law.  See 444 U.S. at 122.  As we explained in McIntyre v. United States:

> [T]he Court [in Kubrick] reasoned that a claimant, once armed with knowledge of the fact of injury and the identity of the parties that caused the injury, is no longer at the mercy of the [defendant(s)]. At that point, claimants can go to others, such as doctors or lawyers, who will tell them if they are victims of malpractice. The same is not necessarily true of plaintiffs who are ignorant of the facts, particularly when the [defendant(s)] may be in possession or control of the necessary information.

367 F.3d 38, 52 (1st Cir. 2004) (citation omitted).  Thus, a plaintiff cannot plead ignorance of his or her legal rights to delay accrual.  Kubrick, 444 U.S. at 123-24.

In determining whether the facts necessary for a § 1983 plaintiff to file suit "are or should be apparent to a reasonably prudent person similarly situated," Jardín de las Catalinas, 766 F.3d at 133 (quoting Nieves-Márquez, 353 F.3d at 119-20), we charge the plaintiff with knowledge of two discrete, but related, sets of data: (1) the "generally available information about the relevant facts," and (2) "the likely results of any further inquiry that a reasonable plaintiff, knowing these facts, would undertake," Donahue v. United States, 634 F.3d 615, 624 (1st Cir. 2011).

---

death); Attallah v. United States, 955 F.2d 776, 778, 780 (1st Cir. 1992) (theft).

Not all cases will require consideration of both sets of information. In some cases, the generally available information that alerted, or should have alerted, the plaintiff to both his or her injury and its likely cause will come to light at some point after the plaintiff suffered the injury but before the plaintiff has undertaken any independent investigation or inquiry. This was so in Skwira, in which we held that a wrongful death claim accrued not at the time of the decedent's passing, but after autopsy results were delivered to the decedent's family and the press had published multiple stories detailing a government investigation into similar deaths that had occurred in the same hospital where the decedent had been treated. 344 F.3d at 80.

In other cases, the generally available information may not be sufficient for accrual, but it may be sufficient to trigger a suspicion in a reasonable person in the plaintiff's circumstances regarding a putative defendant's role in causing the plaintiff's injury. See McIntyre, 367 F.3d at 52 (explaining that "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence" (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998))). Under those circumstances, a plaintiff has a duty to investigate or inquire further regarding his or her

injury and the party responsible for causing it.  See Donahue, 634 F.3d at 624; McIntyre, 367 F.3d at 52.

Our analysis of whether a plaintiff has a duty to inquire employs an objective "reasonable person" standard but, at the same time, it requires us to consider the circumstances of the plaintiff and the context in which the alleged injury occurred.  See McIntyre, 367 F.3d at 52.  In other words, the hypothetical "reasonable person" must be "similarly situated" to the specific plaintiff invoking the discovery rule and must have access to the same information that was available to the plaintiff during the timeframe relevant to the accrual analysis.  See Cascone v. United States, 370 F.3d 95, 104 (1st Cir. 2004).[8]

If, after considering all of the information available to the plaintiff during that relevant timeframe, we conclude that a duty to inquire has been established, we charge the plaintiff with knowledge of the facts that the plaintiff should have uncovered through a reasonably diligent investigation, and then assess whether that information would be sufficient for purposes of accrual.  See McIntyre, 367 F.3d at 52.  A claim will accrue at

---

[8] For example, in Cascone, we held that a reasonable person, similarly situated to the plaintiff, Nancy Cascone, would not have had any reason to be suspicious about the circumstances of the decedent's death because all of the information that might trigger such a suspicion appeared in two regional newspapers outside of the vicinity where Cascone lived.  See 370 F.3d at 105 ("In these circumstances, a plaintiff in Nancy Cascone's position could reasonably be ignorant of the articles in those two newspapers.").

the point during an investigation when a plaintiff, acting diligently, obtained or would have obtained enough factual information about his or her injury and its cause to file suit against a defendant. See Rakes v. United States, 442 F.3d 7, 23 (1st Cir. 2006) (holding that if the plaintiffs had undertaken a diligent investigation after their duty to inquire was triggered, they would have discovered articles implicating the FBI in their wrongful death action by the end of the year 1998, and thus their claim accrued by late 1998). It is also at that point that the statute of limitations begins to run.[9]

In some cases, however, we have found that even the most diligent investigation would not have uncovered sufficient information to allow a plaintiff to take action to preserve his or her rights. In the past, we have reached this conclusion when a defendant took steps to cover up its involvement or to keep information about the plaintiff's injury and its cause confidential. See McIntyre, 367 F.3d at 55-56 (holding that, even assuming arguendo that the plaintiffs had a duty to inquire, their claim would not have accrued during the relevant timeframe because the necessary factual predicate for their claim "was hidden behind a veil of secrecy"); Attallah v. United States, 955 F.2d 776, 780 (1st Cir. 1992) (holding that plaintiffs were entitled to a delayed

---

[9] Of course, in some cases, like this one, a tolling provision will delay the running of the statutory period. See supra.

accrual date where they had a duty to investigate the cause of the death of their courier, but even a reasonably diligent investigation -- which, in fact, the plaintiffs undertook -- would not have revealed the predicate facts for their legal action).

As these cases illustrate, the existence of a duty to inquire does not itself trigger accrual. A claim accrues only when a plaintiff, through diligent investigation or inquiry, uncovers or should have uncovered enough facts to take the necessary steps to take legal action to preserve his or her rights.

Our case law has not always been a model of clarity regarding this aspect of the discovery rule, perhaps due to our use of the term "duty to inquire" (or similar formulations, like "burden to inquire") to mean two different things. In many cases, we have invoked the phrase to describe a putative plaintiff's obligation to diligently investigate or "inquire" regarding the <u>factual</u> predicate for his or her cause of action once a suspicion or hunch has been triggered. <u>See</u>, <u>e.g.</u>, <u>Cascone</u>, 370 F.3d at 104-05; <u>McIntyre</u>, 367 F.3d at 52, 55-56. We adhere to this usage throughout this opinion. The "duty to inquire" used in this sense is a prelude to accrual.

However, in other cases, we have used the phrase to describe the principle that a plaintiff, once armed with the knowledge of his or her injury and its probable cause, cannot plead ignorance of the <u>law</u> to delay accrual; rather, that plaintiff

"bears the responsibility of inquiring among the medical and legal communities" as to whether the facts already in his or her possession, perhaps due to a diligent investigation already undertaken, give rise to a viable legal theory. Gonzalez v. United States, 284 F.3d 281, 289 (1st Cir. 2002) (emphasis added); see also Callahan v. United States, 426 F.3d 444, 453-54 (1st Cir. 2005) (holding that claim accrued at point that "reasonable person [would] inquire," specifically, "by seeking legal advice in order to determine whether action should be taken against the government" (emphasis added)). In these cases, accrual has already occurred by the time a plaintiff makes an inquiry, and that inquiry is not so much a "duty" as a prudent protective step to avoid running afoul of the statute of limitations.

In summary, a § 1983 claim will accrue once a plaintiff is armed with the necessary factual predicate to file suit, including knowledge of both an injury and the injury's likely causal connection with the putative defendant. Under certain circumstances, this information will be apparent from the face of things at the time of an injury, and the claim will accrue at that point. In other cases, this information will only come to light through the release of subsequent factual information that the plaintiff learned or should have learned, even without the benefit of an investigation. And in other cases still, the information that comes to light will not give a putative plaintiff a "complete

and present cause of action," but it will trigger enough of a suspicion in a reasonable person, similarly situated to the plaintiff, to cause that person to undertake a diligent investigation or inquiry into the pertinent facts. In those investigative scenarios, a claim will accrue at the point during the investigation when sufficient facts are or should be uncovered through the exercise of due diligence to give a plaintiff enough information about his or her injury and its cause to file suit. Regardless of how the predicate facts become (or should have become) available to a putative plaintiff, the claim accrues at that point, even if the plaintiff lacks knowledge of his or her legal rights. And, subject to any tolling provision, the relevant statute of limitations period will then begin to run.

Guided by these principles, we now turn to our analysis of the accrual of Ouellette's claims.

## C. Application of Accrual Analysis

### 1. Assessing Whether Ouellette Had a "Complete and Present Cause of Action" at the Time of His Injury

The district court reasoned that Ouellette's "awareness of his abuser's affiliation with the Biddeford Police Department supplied [him] with enough information to lead a reasonable person in his position to seek advice about a possible claim against Defendants Beaupre and the City of Biddeford." See Ouellette, 2019 WL 4467633, at *4 (internal quotation marks omitted). In a

footnote, the court clarified that, "given the nature of the underlying claim, it is highly improbable that any [c]ourt would have granted a motion to dismiss municipal and supervisory liability claims had [Ouellette] advanced those claims at the inception of a civil action within the limitations period." Id. at *5 n.5. Taken together, these statements mean that, in the district court's view, Ouellette's awareness of both his injury and Gaudette's employment relationship with the BPD provided him with a "complete and present cause of action" sufficient for him to file a § 1983 suit against appellees within the six years after he reached the age of majority, and that his failure to do so was based exclusively on his ignorance of his legal rights. In other words, if Ouellette had consulted a competent attorney shortly after he was injured, that attorney would have advised him that he was in a position to immediately file suit against Gaudette's employer and supervisor because of Gaudette's relationship with those defendants, and that he should do so promptly to comply with the statute of limitations.

We disagree with this analysis. A constitutional tortfeasor's employment with a municipality or supervision by a superior state officer does not, on its own, give rise to a "complete and present" § 1983 cause of action. It is well established that the doctrine of respondeat superior, which imposes vicarious liability on an employer for the torts of an

- 25 -

employee undertaken in the course of his or her employment, does not apply to § 1983. See, e.g., Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014) (collecting cases). Rather, a § 1983 claim premised on a theory of supervisory liability must plead an "affirmative link between the behavior of a subordinate and the action or inaction of his supervisor." Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011)). Likewise, a § 1983 action brought against a municipality pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), is proper only where the plaintiff pleads sufficient facts to indicate the existence of an official municipal policy or custom condoning the alleged constitutional violation. See Abdisamad v. City of Lewiston, 960 F.3d 56, 60 (1st Cir. 2020).

Any knowledgeable attorney that Ouellette consulted around the time of his alleged abuse would have told him of these standards and would not have advised him to file a lawsuit against Beaupre and the City of Biddeford in the absence of additional information suggesting that they were also a cause of his injury. Although there is no heightened pleading standard for § 1983 municipal liability claims, see Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163, 164 (1993), a § 1983 lawsuit against Beaupre and the City containing only a bare recitation of the fact that Gaudette engaged in his abuse while on

duty as a BPD officer would not likely survive a motion to dismiss. Thus, Ouellette would not have the benefit of the discovery that the district court suggests might have given him a chance of uncovering facts like those he discovered in 2015, i.e., information directly implicating appellees in Gaudette's alleged misconduct.

Significantly, roughly half of the sixty-three paragraphs in the operative complaint in this case contain information about the conduct and inaction of Chief Beaupre and the City of Biddeford that Ouellette did not have at the time of his injury in the late 1980s. For example, the complaint states:

> Chief Roger Beaupre was given information prior to Larry Ouellette's abuse such that he was aware of and/or should have been aware that Norman Gaudette and at least one other Biddeford Police Officer had been and were sexually abusing young boys, including Larry Ouellette. As Chief, Roger Beaupre turned a blind eye and failed to prevent this abuse. Chief Roger Beaupre's failure to act meant that Norman Gaudette was able to sexually assault Larry Ouellette.

Later, Ouellette's complaint specifically alleges:

> Chief Beaupre engaged in a pattern of altering BPD internal affairs policies and establishing BPD policies that provided him with the opportunity to control and manipulate BPD policies to allow Officer Gaudette to remain in his position during and after sexual abuse allegations were made against Officer Gaudette prior to the time that he sexually assaulted Ouellette.

The complaint also states:

Chief Beaupre also failed to provide mandatory notification to the then-State of Maine Department of Human Services ("DHS"), despite his obligation to do so, of the sexual abuse by Officer Gaudette. Had Chief Beaupre done so, then DHS would have investigated Officer Gaudette and that independent investigation would have shown, prior to Ouellette's abuse by Officer Gaudette, that Officer Gaudette had abused minor boys through his position as an officer of the BPD. Such an investigation would have resulted in the separation of Officer Gaudette from the BPD prior to the time that Officer Gaudette, using his position as an officer of the BPD, molested Ouellette.

These detailed allegations, reflecting information that became available to Ouellette for the first time in 2015, present the kind of assertions of causation that we have typically found necessary to state a claim for supervisory or municipal liability. See, e.g., Sanchez v. Pereira-Castillo, 590 F.3d 31, 50-51 (1st Cir. 2009) (holding that plaintiff stated a Fourth Amendment claim pursuant to § 1983 against sergeant of correctional facility because the plaintiff "specifically allege[d]" the acts by the sergeant that "set in motion" the chain of events leading to a constitutional violation).

The need for a plaintiff to plead more than just an employment relationship to hold a supervisor or municipality liable for the constitutional torts of an employee, and to file a lawsuit to stop the running of the statute of limitations, distinguishes § 1983 claims from FTCA claims, which have produced

much of our federal discovery rule jurisprudence.  Accordingly, the district court's reliance on our FTCA cases was misplaced in these particular regards.  See Ouellette, 2019 WL 4467633, at *4 (citing our FTCA decisions in Skwira, 344 F.3d at 84 (Boudin, C.J., concurring), and Donahue, 634 F.3d at 626).  The FTCA, unlike § 1983, "[i]n substance . . . adopts respondeat superior liability for the United States."  Solis-Alarcón v. United States, 662 F.3d 577, 583 (1st Cir. 2011).  Thus, in order to file an FTCA suit against the federal government, a plaintiff must merely demonstrate that he or she was the victim of a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).

Moreover, unlike § 1983, the FTCA does not even require the filing of a lawsuit to comply with the statute of limitations. See Morales-Melecio v. United States, 890 F.3d 361, 369-70 (1st Cir. 2018).  For a putative plaintiff to preserve his or her legal rights in the context of the FTCA, he or she must merely file an administrative claim indicating: "(1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought."  Skwira, 344 F.3d at 70 (quoting Santiago-Ramirez v. Sec'y of Dep't of Def., 984 F.2d 16, 19 (1st Cir. 1993)).  The Department of Justice has created a standardized form, just two pages long, to facilitate the filing of such claims pursuant to the FTCA's

notice requirement.  See id.; see also Donahue, 634 F.3d at 627 (explaining that "[f]iling [an administrative] claim puts at most a modest burden on plaintiffs").  In contrast, as we have discussed, a plaintiff must file suit to preserve his or her rights in the context of § 1983.  This distinction, blurred by the district court's analysis, is critical for analyzing accrual in the context of § 1983.

In light of these considerations, we hold that the district court erred in concluding that Ouellette's § 1983 claims against appellees accrued at the time of his injury in the late 1980s because of his undisputed knowledge of Gaudette's affiliation with the BPD.  In the context of § 1983, knowledge of a constitutional tortfeasor's employer and supervisor does not necessarily equate to knowledge of a causal connection between the tort and the employer and supervisor.

2. **Assessing Whether Ouellette Had a Duty to Investigate Prior to 2015**

We must next consider the district court's alternative holding -- that Gaudette's employment relationship with the BPD, even if insufficient for accrual at the time of his injury, was still sufficient as a matter of law to trigger a duty to investigate whether the City of Biddeford and Chief Beaupre were at least partially responsible for causing his alleged injury.

Our analysis begins with the generally available information regarding Beaupre and the City of Biddeford's alleged deliberate indifference to sexual abuse by Gaudette. As appellees acknowledge, such information was non-existent prior to 2015. None of the other victims of abuse allegedly committed by Gaudette and other BPD officers went public with their stories, and there was no media coverage or public outcry regarding the BPD and Beaupre's alleged custom of condoning or covering up sexual abuse by BPD officers.

As for the specific information available to Ouellette regarding the BPD and Beaupre's role in his alleged abuse, Ouellette knew that Gaudette was a captain in the BPD -- indeed, he occasionally met Gaudette at the police station, and Gaudette frequently left his police radio on while he allegedly engaged in sex acts with Ouellette. He also knew that Gaudette, on at least two occasions, used his position as a BPD officer to help Ouellette overcome legal trouble. He knew that after he reported Gaudette's conduct to the BPD, the BPD and the State Attorney General's Office initiated investigations into Gaudette.[10] And he knew, or should

---

[10] Although Ouellette claims that he did not know about the Internal Affairs investigation -- an account that appellees dispute -- he remembers speaking with multiple BPD officers regarding his abuse. He also remembers meeting with Michael Pulire and various investigators from the Maine Attorney General's Office and telling them about his experiences with Gaudette.

have known, that Gaudette was reinstated to his leadership position in the BPD after being accused of sexually abusing him.

Although a reasonable jury might plausibly conclude that, based on this information, someone in Ouellette's position should have become suspicious of deliberate indifference by the BPD, such a finding is not inevitable on the record before us. In reaching a different conclusion, the district court, once again, simply relied on Gaudette's affiliation with the BPD to conclude, as a matter of law, that Ouellette should have been suspicious that the City and Beaupre might be liable for causing his injury and should have investigated accordingly. See Ouellette, 2019 WL 4467633, at *4-5. This was error.

There is no evidence in the record that Ouellette was ever told that the investigations into Gaudette's misconduct were provoked by allegations against Gaudette brought by additional victims, or that there was a separate investigation into the BPD on a larger scale regarding a pattern of sexual abuse by its officers. The fact that Gaudette was a captain in the BPD and may have used that role to take advantage of Ouellette hardly supports the inference that Gaudette's higher-ups condoned his conduct, or even knew about it. Indeed, to Ouellette's knowledge, no BPD official ever learned that Gaudette had sexually abused a minor until the day that Ouellette came forward. Moreover, when he did report his abuse to the BPD, several officers followed up with

him, and that report, at the behest of the BPD, triggered an external investigation by the York County District Attorney's Office and, subsequently, the Maine Attorney General's Office.

In these circumstances, we think a jury could reasonably find that a reasonable person would believe that the BPD took the allegations seriously and conducted an appropriate investigation. In so concluding, we do not pass judgment on the adequacy of the BPD's investigation into Ouellette's allegations of abuse. Rather, we simply note that, based on the information available to Ouellette in the early 1990s regarding the BPD's investigation, a jury could reasonably find that a reasonable person in Ouellette's shoes would have no reason to suspect that the BPD was not doing its job, or worse, that it was covering up Gaudette's conduct. Accordingly, a reasonable jury could conclude that Ouellette had no duty before 2015 to do more to ascertain appellees' possible role in his abuse.

We thus hold that the district court erred in concluding that information available to Ouellette prior to 2015 necessarily triggered a duty to inquire into claims against appellees.[11]

_____

[11] We disagree with Ouellette's contention that the district court improperly resolved material factual disputes related to the duty-to-inquire question. The district court's error was not that it improperly chose between competing facts in the record -- indeed, the facts that the district court relied upon for its summary judgment ruling are undisputed. Its error was the conclusion that it drew from those facts, i.e., that the only conclusion that a reasonable jury could reach is that Ouellete had

- 33 -

### 3.    Reasonably Diligent Investigation

In light of its erroneous conclusion as a matter of law that Ouellette had a duty to investigate whether the BPD and Beaupre were responsible for his injury at the time that it allegedly occurred, the district court went on to address the second component of the accrual analysis -- namely, assessing the scope of a reasonably diligent investigation under the circumstances and the contents of the information that such an investigation would have uncovered.  The district court also erred in that analysis.

The district court suggested that a diligent investigation into claims against the City of Biddeford and Chief Beaupre simply required hiring an attorney and filing suit against Gaudette in his individual capacity, and then conducting discovery for documents related to appellees' facilitation of Gaudette's alleged misconduct.  See Ouellette, 2019 WL 4467633, at *5 ("Here, for example, Plaintiff could have consulted an attorney, initiated a civil action against Gaudette, conducted discovery for records concerning any history of reports of similar conduct in the past,

---

a duty to inquire further into the BPD's role in his alleged abuse as soon as he became aware of both his injury and Gaudette's employment relationship with the BPD.  See Villarini Garcia, 8 F.3d at 87 ("[E]ven where no raw facts are in dispute, the issues of due diligence and adequate knowledge are still ones for the jury so long as the outcome is within the range where reasonable men and women can differ.").

- 34 -

taken appropriate depositions and amended his complaint to pursue supervisory and municipal claims.").  We disagree.

Perhaps a reasonable jury could find that Ouellette should have consulted an attorney or other professional to assist him in investigating potential claims against appellees.  But the same jury could easily conclude that even the most conscientious lay person would not reasonably think that a diligent investigation requires filing a lawsuit against one party to gain access to the tools of civil discovery for the purpose of uncovering information regarding other possible parties.  Cf. Ortega Candelaria v. Orthobiologics LLC, 661 F.3d 675, 681 (1st Cir. 2011) ("The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." (quoting Holland v. Florida, 560 U.S. 631, 653 (2010)).

Accordingly, we decline to hold as a matter of law that a putative plaintiff must file a lawsuit and undertake civil discovery -- a very expensive step -- to satisfy the demands of due diligence.  Such a holding would, in effect, apply the statute of limitations for a plaintiff's § 1983 claim against a known individual state actor to any as yet unknown future claims against different government employees or entities subject to distinct theories of liability.  Moreover, it might also encourage putative plaintiffs to file lawsuits that would effectively function as

fishing expeditions that could potentially run afoul of the rules governing discovery in civil actions.[12]

We also reject the district court's conclusion that Ouellette would have discovered facts implicating the BPD in Gaudette's alleged misconduct if he had timely filed suit against Gaudette. It is far from certain that permissible discovery in such a case would aid his investigation into the City and Beaupre. This uncertainty is only heightened by the fact that the record contains at least some undisputed evidence suggesting that the BPD did not appropriately maintain files containing even the reported allegations against Gaudette. See supra note 5. We thus disagree with the district court that a reasonably diligent investigation would have necessarily provided Ouellette with a "complete and present cause of action" prior to 2015.

## III.

As an alternative argument, appellees assert that, under our precedents, Ouellette's § 1983 claims against them must be dismissed because his § 1983 claim against Gaudette is time-barred.[13] Notably, Ouellette has conceded that his § 1983 claim

---

[12] Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."

[13] Although the district court did not decide the case on this ground, appellees preserved the argument in their briefing before the district court, and we may affirm on any basis supported by the record. See López-Santos v. Metro. Sec. Servs., 967 F.3d 7,

against Gaudette accrued at the time of his injury, and thus that the statute of limitations expired six years after he reached the age of majority.  For this reason, he voluntarily dismissed that claim against Gaudette in the early stages of this litigation. See supra Section I.B.

It is well established that, without a finding of a constitutional violation on the part of a municipal employee, there cannot be a finding of § 1983 liability on the part of a supervisor or municipality.  See, e.g., Martinez v. Colon, 54 F.3d 980, 990 (1st Cir. 1995) (supervisory liability); Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir. 1996) (municipal liability).  However, contrary to appellees' assertion, we have never held that the dismissal of a § 1983 claim against an individual officer on the basis of the statute of limitations compels dismissal of timely supervisory and municipal liability claims premised on that officer's alleged constitutional violations.[14]

---

13 (1st Cir. 2020).

[14] Appellees erroneously suggest that we reached such a conclusion in Nieves v. McSweeney, 241 F.3d 46 (1st Cir. 2001). Although we held in Nieves that the appellants' supervisory and municipal claims were time-barred, given that the appellants' claims against the individual tortfeasors were time-barred, that was so only because there was no dispute that the claims against all the defendants accrued at the same time.  See id. at 50-53. We thus did not comment on a situation, like the one presented here, in which a plaintiff asserts that the supervisory and municipal claims accrued at a later date than those brought directly against the individual tortfeasor.

Indeed, in Wilson v. Town of Mendon, we explicitly held that "[t]here is . . . nothing to prevent a plaintiff from foregoing the naming of an individual officer as a defendant and proceeding directly to trial against the municipality." 294 F.3d 1, 7 (1st Cir. 2002). In reaching that conclusion, we rejected the argument that such a scenario would require a court to adjudicate the rights of an individual not before it. See id. at 8. Rather, we held that, for a plaintiff to prevail under such circumstances, a jury would merely have to make "a factual finding regarding the implications of [the individual officer's] conduct for the possible liability of the [municipality] as her employer." Id.

In this case, if Ouellette is to prevail on his § 1983 claims against appellees, he will have to convince a jury to make a preliminary factual finding that Gaudette violated his constitutional rights. Of course, that finding will not be binding on Gaudette or subject him to damages liability, given that the constitutional claims against him are barred by the statute of limitations.[15] See id. (noting that the appellant "was not seeking

_____

[15] We recognize that there may be "a visceral unease" at the idea that Gaudette's actions could be "the subject of a jury's condemnation" in a case to which he is not a party. Wilson, 294 F.3d at 8 n.17. But, as we explained in Wilson, our law permits such scenarios: "[u]nindicted co-conspirators are frequently the subject of adverse jury findings, as are employees whose employers are sued directly on a theory of respondeat superior for their alleged torts." Id. Moreover, Ouellette still has a live state

- 38 -

an adjudication of [the individual officer's] rights, nor a judgment binding on her personally"). Rather, such a finding will merely establish the possibility that appellees may be held responsible for Gaudette's allegedly unconstitutional conduct under Ouellette's theory of deliberate indifference.

## IV.

The district court erred in concluding as a matter of law that Ouellette's § 1983 claims against appellees accrued at the time of his injury in the late 1980s exclusively because Ouellette was aware of Gaudette's affiliation with the BPD. Moreover, a reasonable jury could find that Ouellette had no duty to diligently investigate his claims against appellees prior to 2015, when the social media posts and press coverage first publicized Chief Beaupre and the City of Biddeford's alleged deliberate indifference to the sexual abuse of minors by BPD officers, thus alerting Ouellette that their actions or inaction may have also been a cause of his injury. Accordingly, the district court erred in withdrawing this duty-to-investigate question from the jury and concluding that Ouellette's lawsuit, filed less than a year after those social media posts were

---

law sexual assault claim against Gaudette, which might well be adjudicated in the same trial as his § 1983 claims against Beaupre and the City of Biddeford. (In Maine, there is no statute of limitations for civil claims "based upon sexual acts toward minors." See Me. Stat. tit. 14, § 752-C(1).)

publicized in October 2015, was time-barred.  Finally, the district court erred in concluding that, if Ouellette had undertaken a diligent investigation of his claims subsequent to his injury, he necessarily would have uncovered sufficient factual information to file suit against Beaupre and the City prior to the expiration of the statute of limitations in June 1995.

We vacate the grant of summary judgment and remand for further proceedings consistent with this opinion.  Costs are awarded to appellant.

So ordered.